Good morning. May I please the court? Artem M. Sarin for the petitioner, Ms. Halkobyan and her young daughter, Annie. I would like to reserve two minutes of my time for the rebuttal. The main issue in this case is whether the petitioner's testimony was credible or not. Agency made an adverse credibility findings based on three areas. And I'm going to start with the first area where her declaration that was attached to the I-589 application for asylum stated that she made numerous complaints to the police. And I emphasize the word numerous because that came as a center of controversy. During the testimony, she testified that she made only two complaints to the local police. However, she did make a number of complaints to the local authority, which subsequently was translated as a district officer or divisional inspector. That district officer or divisional inspector was somebody who was representing the government in her housing development. And that person's responsibility was to report any problems to the police. And my client did testify that, indeed, that district officer complained to the police when she reported abuse to him or her. So bottom line is, in her declaration, when she said numerous times, the word numerous emphasized, she complained to the police. And then in her testimony, she says, I complained to the police twice, but I also made several complaints to the district officer, who, in turn, complained to the police. There is no inconsistency between her testimony in court, that she complained to the police twice, and then complained to the local government authority, who, in turn, complained to the police for her, and this declaration. I think we got that point. Yes. So how about, I think the thing that the, just speaking for myself at least, the, so much of her testimony is about the beatings that she got at home, the persecution, the beatings, harassment, and so on. And that whole series of questions and answers where the I.J. then steps in to try to clarify what the I.J. obviously thought was an inconsistency, and that is, she starts off talking about being beaten. She gets asked about the causes a number of times, and she cites the three examples in 2001, I think it is, three incidents, which she did report in one or part of it to the police, in fact. But all the 2001 incidents were in the time frame of her being involved with this soldier who had been raped that she was going to testify about. But she had ascribed the family beatings to an opposition to her being involved in the student group, which she said she got out of back in 1998. And the I.J. understood it at the time, listening to it, didn't have the benefit of the transcript obviously, and says, wait a minute, how did your, how can your beatings in 2001 have anything to do with your political activity in the student group? And then she says, well, it was secret. And the I.J. says, well, yeah, if it's secret, that's fine, but how did your family know about it? And so when I read it through the first time, I said, I can see what the problem, you know, it looks contradictory. And in fact, she says, the I.J. says, he or she says, Counsel, I don't like to interrupt, but it seemed inconsistent, and she hasn't been able to explain it. How do you explain it? I'll tell you what my benign understanding could be, would be, that she was, in her mind, linking her domestic abuse over a long period of time. And in her mind, the punishment she was getting at home were a continuation. First it was because she was in the student group, and then it manifested itself in the soldier incident, and she was involved in, by her testimony, in activism about domestic violence, and that it's really a miscommunication as opposed to a lack of credibility. I agree with that characterization. I also looked at it from a perspective of timeline. It appears that she married, non-officially married, in about 1998. She registered her marriage in 2001, right about before her daughter was born. So it looks like her activities in that student organization ceased in about 1998. Now, it appears that once she was pretty much sold into that family, as she characterized as she was given to that family, they already knew about her activities, but didn't appreciate that, and they didn't want her to participate. She claims that she participated in secret, and I understand how she was constantly abused. In her declaration and in her testimony, she constantly says, I was constantly abused in the family. However, the center of abuse in 2001 incidents was around the soldiers' rape and soldiers' beating. So in my opinion, family kind of related to the fact that she's active politically or in some kind of student organization prior to her being married, and now she's bringing that activity back by, as she characterized, dealing with other people's business. But also, as I read between the lines here and somewhat in the lines, they may have assumed that it was because of the student organization. And, in fact, she was in contact with the student organization around this issue with the soldier. That is correct. Also, the fact that she is politically involved with the student organization is at least circumstantially confirmed by the fact that she is active in the United States. At the last hearing in immigration court, her attorney submitted a number of awards that show that she still continues to be active in the United States in different school organizations. This emphasizes the fact that she indeed was involved in some kind of organization at her home. So it just shows her character that she keeps getting involved in the public organizations and appears that when she was in the family, she was abused for her speaking out or doing anything but her work, as she characterized that. Assume that, then how does it tie into a protected ground? This is family abuse. That is correct. But it looks like the family was against her speaking out and supporting, in this particular case, No, that's family, it's not government abuse. But the government refused to protect her from the private actors because the government was in line and actually told her that you have to be quiet, you have to not embarrass your family, you have to go back to your husband. And the family was pretty much doing the government's job by trying to force her to be quiet. But also, this is what I was about to ask you. Structurally speaking, at this point, the only thing we have before us is a credibility determination. Is that right? I agree, because BIA only put a footnote that they don't see a nexus in there. There was no actual physical discussion of the nexus. And they didn't even quite say. It was a little vague. I don't know if they decided it or not. We can ask the government. It was a little unclear to me whether they decided the nexus issue or haven't decided. Because of the footnote, I don't see it as a decision on the nexus. And if this court overturns negative credibility determination, I would ask the court to remain back to the board for perhaps additional briefings so we can discuss the nexus in school. Now, the other issue we have is inconsistency between her second declaration that says she assisted the boy versus her first declaration and her testimony when she actually said that she simply was willing to testify, to provide facts, what she saw, the abuse in a hospital. And I understand why a judge brought it up. But if you look at the second declaration, it's a very vague declaration. I really don't know why it stated she assisted the boy. It wasn't in her native language. It wasn't translated. And the ---- Well, the first one says I assisted the boy to file an official complaint against an Army officer. But, in fact, the complaint was on behalf of the boy. And she did ---- my understanding is that she assisted them not only by agreeing to testify, but also by bringing the information to the parent's attention in the first place. That is correct. And also she's not bolstering her claim by stating that she was involved in filing an official complaint. She's actually saying that she brought it to everybody's attention. She was ready to testify. She simply did not participate in perhaps writing a complaint or taking a complaint to the authorities. So I don't see it as an inconsistency that goes to the heart of the claim. Okay. Thank you. Now, she offered to testify on the soldier's behalf. Yes, she did. And that's where her problem started. But it appeared to me the big thing she did was that it was sort of against the rules to even tell the parents about what happened. And she told them. Well, other than the fact that it's a taboo subject, it appears to be, in this country, is that the army abuse and country condition reports actually support that. The fact that she was bringing up the army abuse incident into the legal system and nobody wanted to hear this, that in itself brings the awe of the family and the government against her. Okay. Thank you. Thank you. Now, wasn't she beaten by her father-in-law and her husband for her political activities? I'm sorry. Wasn't she beaten by her father-in-law and her husband for her political activities, including her participation in the student organization? It appears that the family did beat her for speaking out, trying to testify, and at least abused her for her activities in the student organization. And then in September, I think it was the 5th, 2001, she was beaten because she promised to testify in the soldier's trial. That is correct. It appears that the family received subpoenas, didn't give it to her, but did show it to her that the subpoenas have a right to the house, and that kind of triggered the event. She was also beaten by the police. But as you say, the nexus issue isn't before it's at this point. That is correct.  Thank you. Good morning, Your Honors. I feel like you're on an uphill slope. We'll see. May it please the Court, Jem Spohn is on behalf of the Respondent. Petitioner enjoyed a full and fair hearing before the agency. I was about to say something similar. This seems like an unusually weak adverse credibility finding. Do you disagree? I do disagree, Your Honor. I think, unfortunately, this is one of those cases in which because of the affidavits submitted by a petitioner, because of her testimony, we simply don't know what to believe. This is not a situation that ---- I think I know what to believe. I mean, I don't ---- it doesn't seem at all strange to me for someone to say I assisted the boy in filing a complaint when what actually happened was I told his parents that he was beaten and raped by Army people and that if they filed a complaint, I'd be willing to testify. I would subsume that within her earlier statement. It seems perfectly coherent to me. Her explanations for the inconsistencies, however ---- Let's assume there's an inconsistency. Petitioner initially indicated in her written statement that she had assisted the soldier and his family in filing complaints with the military. Well, that's if you want to read something literally. But if I were to write a short version of what she actually did, I might well have written it that way. Unfortunately, that's not what we are permitted to do in these cases. I'm sorry? Why not? Constructing a short summary or eliciting some ---- But you're turning a statement into, you know, a finite statement. It's inherently ambiguous. If I tell somebody that they ought to complain and they ought to go file a complaint, have I not assisted? You certainly have. Okay. You certainly have. But again, if I may, that is Petitioner's representation in her first written statement. Well, she did. She did just those things. Correct. But we then have Petitioner's testimony. Which was? Which was, if I might, Petitioner unequivocally stated that she made no recommendation concerning whether the soldier or his family should file a complaint. Okay. And very narrowly restricted the involvement. But if you file a complaint, I will testify. And moreover, they would never have known anything about this to even file the complaint if she hadn't told the parents. Correct, Your Honor. So ---- Well, is that your strongest argument for lack of credibility? No, it's one of several. Okay. And perhaps the most difficult aspect of this case are the explanations Petitioner offered when confronted with ---- Well, if you think there were ---- But first you have to have contradictions to begin with. And that requires reading these statements in the most non ---- in a way that people do not speak, with a precision that people do not speak with. I agree, Your Honor. I agree. Good. But in ---- What's your next ---- What's the next strong point you have? The next illustrative inconsistency that we would point to are the circumstances surrounding the alleged beating on September 5th of 2001. Petitioner, again, testified that she had ended her involvement with the student organization in 1998, but then testified that her husband and father-in-law beat her because she wanted to attend a student organization meeting. Again ---- What does she say that? That is at page 153 to 155 of the administrative record. The problem we run into is her explanation when confronted by the immigration judge with what is clearly a tension between her representations, either that she ended her involvement in 1998 or that that was the ---- Let's stop before you go racing on. You've been good enough to cite the transcript. This is what I said. What? You said 153 to 155? Yes. That is the ---- And where is the statement that you just ---- At 154, she says, what other problems did you have while in Armenia? At home, I had problems. What problems? I was oppressed by my family members. Father-in-law, husband, would continue what he was doing. Did this oppression include physical abuse on approximately ---- How many occasions? She says on approximately occasions. Always at home, they would use obscenities. Treat me rudely. There were many occasions. Do you have an estimate? There were three major incidents. Could you tell me when? August of 2000. And then she goes in to the time frame, which is the more immediate one, which is the soldier event. And then she talks about, they were not allowing me to do anything. And that's why I ask and goes on about the soldier event. And then she talks about when she's confronted by the IJ. She goes back and says, I was still participating in the student work and all of that. They didn't know about it. Understandably, the IJ is saying, wait a minute. If they don't know about it, then how can that be their motivation? But when you look at the inception of the question and the line of questioning, I can read that as she is not lying. She is unclear. She is not clarifying an inconsistency. We have the benefit of going back and parsing it. You and I and everybody can read this and go back and look at it, and it's all stark. But to be candid about it, I was skeptical at the beginning, and I read through it, and I think I can understand why she slipped. She gets asked a question. She's talking about a course of conduct. You look at her history of being involved politically, actively in opposing domestic violence. There's the culture of beatings. And for us to make a bright line separation. And I will tell you the thing, counsel, that tips me a bit is that she doesn't dissemble. On the question about going to the student activists, she freely admitted that she went to them because of her own domestic abuse. She didn't say she was doing it on behalf of the soldier. She could have, you know, then tried to enhance what she was doing, aggrandize, but she didn't. So I think, you know, I read this testimony. I mean, we see so much testimony. I've seen so much pattern testimony on seat cases and Chinese cases. Reading through this, it comes across on a cold, admittedly, on a cold transcript. And I somehow think this lady got a bum rap. But it's crucial to remember, Your Honor, that it is. The standard of review. Perhaps that's where I'm headed. I would just remind the court that it was petitioner's burden at each level, before the agency, before the asylum officer, before the immigration judge, before the board, to prove in a consistent and credible manner the basis of her claim. That's a burden she had to sustain. She did not. It may be cold. It may be parsing testimony at this juncture. But the necessary exercise is to go back through the transcript, go back through her evidence, and see what we have. But here's the problem with something like that, okay? Life doesn't work that way. I'm seeing 157, where in a critical sentence, there's obviously a misprint, so I can't understand it, or a mistranslation. It says, earlier you told me it wasn't because of the guy at the hospital. Now you're telling me that it wasn't the reason because of the guy at the hospital. And then she says, in trying to reconcile this on the student organization, she says something that's translated as, well, they both released this incident because I participated at this student organization. I don't know what that means. It's obviously an error. It may be an error, Your Honor. I mean, it may be. It is an error. I mean, that's not a sentence that somebody translated or transcribed. I do have the page up. Could I just ask you to point me again to the specific file? I apologize. 157. Right below the middle. Well, they both released this incident. The blind 16. Yes. Thank you. Because I participated at the student organization, and now I was trying to help this soldier. Again. That's her ultimate explanation, and it's obviously incoherent. We have another ultimate explanation at 156, I believe. I just responded when pressed by the immigration judge because I couldn't, because they were. Where is it? This is at 156, just a page before. Oh, before. Yes. That's incoherent. She said, because I was trying to help this guy. And then he goes on and he tries to tie that into the student organization. And here she's trying to explain what the two have to do with each other. And I assume what she's trying to say is that they were angry at me because I participated in this student organization. They thought this was more of the same. That's what I would interpret her to mean. But there's a problem here because it's an error. It may be. But, again, you have to bear in mind that this comes from Petitioner to a translator, from that translator into the record. I understand that. But how can you then rely on this explanation when you can't even read it? Well, that is not an issue before this Court. Petitioner has attempted to distance herself from her written affidavits. No, but this doesn't. This is not. It's clearly not what she said. But it is what we have, Your Honor. And that translation itself is not. Yeah, but we can consider that things are lost in translation. Every day. Absolutely. And there are a number of Armenian dialects, too. Correct. Armenians who live in one country have trouble understanding the language of an Armenian who grew up in another country. Let me ask you a question. Just like I go to London and I can't understand 90 percent of the English language. Do you believe that the BIA decided the nexus question or not? No, we do not believe that they did. The only issue presently before this Court is this adverse credibility determination and remand is therefore appropriate to allow the agency, assuming that the other state does not. This little footnote was not. It was just some usings. I believe so. And I believe that is the approach taken in Respondent's brief in this case. But I would be happy to investigate that further. I would just say I see that my time has run. Thank you. Thank you, Your Honor. Well, very briefly, I am glad at least that we agree with the government that they did not decide the nexus. So I would also ask the Court, if negative credibility determination is overturned, I would ask the Court to remand it to the Board so we can actually have a full review. I also would like to mention that even though, at least in theory, there was an asylum officer, there was a Court, and there was a BIA, asylum officer's review is not before us. We do have the judge's full review. And the BIA kind of stated that they agree with the judge. They didn't have full analysis of the case. They simply repeated what the judge said. So I would rather say that we had a judge's review. The judge did not have benefit of the transcript before him. And at this point, as Honorable Judge Person stated, there is a lot in the transcript that is not very clear. What she said, whether it was a problem with the translation or the transcript, it's not really clear what it is. Thank you. Thank you. Does your brother practice immigration law? I don't have a brother. You have a brother. You don't have a brother. I don't have a brother. Is there another immigration lawyer that has your same last name? There is another immigration lawyer with a Syrian. I don't know him. I've never seen him. But when I type my name in the State Bar of California, the two Syrians come up. All right. Well, you've done a good job, both of you. Thank you. Thank you, both. Very helpful. We can distinguish them. He wears a handkerchief in his pocket and a full head of hair. But you look good. All right.
judges: Pregerson, Fisher, Berzon